IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF OREGON

CASCADIA WILDLANDS PROJECT,                Civil No. 04-6440-TC
et al.,
                                           Order
                Plaintiffs,

        v.

SCOTT CONROY, Rogue River-
Siskiyou National Forest
Supervisor, et al.,

                Defendants.


    The complaint seeks declaratory and injunctive relief for

alleged violations of the National Forest Management Act (NFMA),

the National Environmental Policy Act (NEPA) and the Appeals

Reform Act (ARA).  Plaintiffs' claims arise from defendants'

decision to implement the Biscuit Fire Recovery Project.

Plaintiff's motion for preliminary injunction is before the

court.  The court previously denied plaintiffs' request for a

temporary restraining order.

///

Background

The Biscuit Project is the response of the Forest Service and the Bureau of Land Management (BLM) to a 2002 wildfire that burned millions of trees on nearly 500,000 acres, primarily on the Siskiyou National Forest (SNF). The Service describes the project as among the largest and most complex in its history. Twenty-three regional and national fire management teams contributed to fire suppression efforts. Seven thousand firefighters and support people were deployed during the peak of the blaze. The affected area includes nearly all of the Kalmiopsis Wilderness Area, 164,923 acres in late-successional reserves (LSRs), 3,428 acres in Wild and Scenic River Corridors, and approximately 188,000 acres in inventoried roadless areas (IRAs). The Kalmiopsis Wilderness Area is well-known as a repository for rare plants, and the Siskiyou National Forest as a whole is similarly renowned for its diversity of plant life. FEIS III-113.

Following fire suppression activities, resource specialists analyzed impacts through aerial photography and field reconnaissance. In December, 2002, and January, 2003, the Service held ten public meetings to gather input from residents of affected communities concerning desired treatments and options. On January 30, 2003, the Service published the Biscuit Post-Fire Assessment, setting forth options for moving toward

desired conditions. The Service identified needs to recover economic value from burned timber, reduce risk to nearby communities and forest resources from future high intensity fire, and revegetate burned conifer stands and other burned plant and animal habitats. FEIS I-1-6.

The Service issued a draft environmental impact statement (DEIS) on November 23, 2003, triggering a public comment period that ended on January 20, 2004, after a fifteen-day extension. The Service received more than 23,000 comments. In December, 2003, the Service held five more public meetings to explain the DEIS. Approximately 400 people attended these meetings. Thereafter, the Service issued a two-volume, Final EIS (FEIS) approximately 1,000 pages in length (including appendices), in which the Service considered seven alternative responses to the fire.

On July 8, 2004, Rogue River-Siskiyou National Forest Supervisor Scott Conroy issued the LSR and Matrix RODs, authorizing activities in LSRs and matrix lands outside of IRAs. These RODs and two others implement with modification the action described in the FEIS as alternative 7. "Alternative 7 was broken down into four RODs in recognition of legal responsibilities and differing land management objectives." LSR ROD at 1. The RODs not implicated in this case authorize activities on Forest Service lands within IRAs and on lands

managed by the Bureau of Land Management.  Id.

With the LSR ROD, Conroy decided to "select 6,305 acres of salvage harvest on LSR lands, create 52 miles of Priority 2 fuel management zones (FMZs), plant 12,700 acres of burned conifer stands and associated riparian reserves, seed 1,630 acres of meadows and savannas, reduce tree encroachment on 590 acres of meadow, maintain 200 miles of road build, and, subsequent to use, decommission 1.3 miles of temporary road and road realignments." LSR ROD at 2.  The LSR ROD authorizes roughly 113 million board feet (mmbf) of salvage timber harvest.  Of this quantity, 54.4 mmbf is covered by Regional Forester Linda Goodman's June 3, 2004 emergency situation determination (ESD).  The ESD exempts the challenged timber sales from the automatic stay normally triggered by the filing of an administrative appeal, based on Goodman's finding that delaying implementation of the sales would result in substantial economic loss to the federal government. Salvage logging subject to the ESD is slated to occur on one half of one percent of the recovery area, and 1.5% of LSRs within the recovery area.

With the Matrix ROD, Conroy decided to select 4,460 acres of salvage harvest on matrix lands, create 67 miles of FMZs, plant on 8,400 acres of burned conifer stands and associated riparian reserves, seed 400 acres of meadows and savannas, reduce tree encroachment on 100 acres of meadow, close 18 miles of road,

decommission 10 miles of road, stabilize 37 miles of road, maintain 300 miles of road build, and, subsequent to use, decommission 1 mile of temporary road and perform 4 road realignments. Matrix Rod at 2.

Under alternative 7, only dead trees would be salvage harvested. FEIS II-35. The FEIS defines dead trees as trees with no green needles or leaves. Id.

The complaint asks the court to declare, inter alia, that the LSR and Matrix RODs violate NFMA and that the FEIS violates NEPA, and to enjoin defendants from awarding timber sales or conducting ground-disturbing activities in LSRs until defendants comply with NFMA, NEPA and the ARA. Complaint at 48.

This is the fifth case filed in this district challenging the July 8, 2004 RODs. Although the LSR ROD authorized immediate logging of a significant portion of the total harvest authorized by the ROD, plaintiffs did not file the complaint in this case until December 23, 2004. Plaintiffs filed their motion for preliminary injunction and temporary restraining order on February 28, 2005, one week before the expiration of a stay of logging in LSRs ordered by the court of appeals, and nearly eight months after issuance of the RODs.

## Discussion

Preliminary injunctive relief should be ordered if plaintiffs demonstrate either a combination of probable success

on the merits and the possibility of irreparable injury or that serious questions are raised and the balance of hardships tips sharply in their favor. Earth Island Institute v. United States Forest Service. 351 F.3d 1291, 1298 (9th Cir. 2003). These alternative formulations are extremes on a continuum where the required showing of irreparable injury increases as the probability of success decreases, and vice versa. Id. at 1300. If plaintiffs demonstrate a possibility of success on the merits, the court must also consider whether the public interest favors an injunction. Amoco Production Co. v. Village of Gambell, 480 U.S. 531, 542, 545 (1987).

I.  Likelihood of Success of Plaintiffs' Claims

     A.  NEPA Claims

          1.  Analysis of Environmental Effects

     Plaintiffs first argue that the Service failed to adequately consider and/or disclose environmental consequences of the project, especially impacts from wet-season logging and hauling on Port Orford Cedar trees (POC), tier 1 key watersheds, fish and aquatic habitat, and designated and eligible Wild and Scenic Rivers (WSRs).

               a.  Port Orford Cedar

     Plaintiffs contend the Service failed to adequately consider cumulative and site-specific impacts on POC and the spread of Phytophera lateralis (PL), a root disease usually fatal

6 - ORDER

to POC.  Plaintiffs argue that wet season and wet weather logging
pose great risk of spreading PL, and that the FEIS assumes that
wet season and wet weather activities will not take place, or
that mitigation measures will be followed.  Plaintiffs contend
that intervenors are conducting wet season and wet weather
activities without following required mitigation measures.

     To the extent plaintiffs fault the FEIS generally for not
adequately discussing project impacts on POC and the spread of
PL, the court concludes at this stage that plaintiffs have not
demonstrated serious questions or probable success.  The FEIS
tiers to the 2004 Port Orford Cedar Final Supplemental
Environmental Impact Statement – Management of Port-Orford-Cedar
in Southwest Oregon (2004 POC FSEIS).  Attorneys for the parties
seemed to agree at oral argument that this document is the
response of the Service and the BLM to NEPA violations identified
in <u>Kern v. Bureau of Land Management</u>, 284 F.3d 1062 (9th Cir.
2002).  Plaintiffs do not appear to argue that the 2004 POC FSEIS
lacks a sufficient analysis of environmental effects so as to
render tiering impermissible.  As noted, plaintiffs argue that
the Service and intervenors are not in compliance with POC
guidelines and mitigation measures which the agencies assumed
would be followed when they prepared their analyses of expected
environmental consequences.  Plaintiffs specifically maintain
that the Service and intervenors are not adhering to required

seasonal and wet weather activity prohibitions and vehicle
washing requirements.

The parties submitted evidence regarding weather conditions
and current activities. The parties have not seriously litigated
the admissibility of this evidence. The evidence may be
admissible if necessary to demonstrate that the Service failed to
consider a relevant factor bearing upon its decision, or to
determine whether the Service is implementing required mitigation
measures.[1] See Southwest Ctr. for Biological Diversity v. United
States Forest Svc., 100 F.3d 1443, 1450 (9th Cir. 1996); Tyler v.
Cisneros, 136 F.3d 603, 608 (9th Cir. 1998).

To prove the alleged violations of required mitigation
measures, plaintiffs submitted photographs of wet Forest roads
and vehicles traveling on wet Forest roads, including Road 4201
on the Fiddler LSR timber sale haul route. Several photos show
puddles, water in ditchlines and mud. See Shelton Decl., Exs.,
Adams Decl., Exs., Brown Decl., Exs., Sklar Decl., Ex., 2nd
Shelton Decl., Exs. Plaintiffs also submitted photographs of an
open POC gate on Forest Road 4201-141. 2nd Shelton Decl., Photos

---

[1]As noted below, plaintiffs also submitted the declarations
of scientists. The parties also have not seriously litigated the
admissibility of this evidence. The declarations may be
admissible to prove that the Service failed to consider an
important aspect of the project, or for other reasons identified
in Southwest Ctr., 100 F.3d at 1450. Because the parties have
not seriously litigated admissibility questions, the court at
this time expresses no opinion on the admissibility of this
evidence at the merits stage.

1-3. Finally, plaintiffs submitted weather information
downloaded from the internet by counsel for plaintiffs. It is
undisputed that tree fallers are working on the Fiddler and Berry
timber sales during periods of snow or wet weather.

John West of Silver Creek Timber Company testified as
follows: (1) falling and yarding commenced on the Fiddler sale on
March 7, 2005; (2) entry into the sale area was not prohibited
prior to that date; (3), Silver Creek first set up a vehicle
washing station for the Fiddler sale on March 19, 2005; (4) good
weather prevailed in the sale area from March 7-19, 2005; (5)
(6) hauling commenced March 22, 2005 when eight loads were hauled
in mostly sunny weather, prior to the onset of light showers; (7)
five inches of snow fell five miles up the road at the top of the
sale area; (8) fallers continued to work in the snow; and (9)
West did not observe and is not aware of log hauling occurring
when puddles were present, although he was present on the sale
area each day the sale operated. SNF Contracting Officer Thomas
Link stated in his declaration that typically 30% of the annual
timber harvest on the SNF is accomplished during fall or winter
months. Link Decl., ¶ 4.

The FEIS lists limiting activities to the dry season
(generally defined as June 1 to September 30) as a mitigation

measure to reduce the spread of PL.[2]  FEIS II-49.  The FEIS
further states,

> Operations may be permitted during periods of
> unseasonably dry weather outside of the normal
> operating period.  Operations will be suspended during
> periods of unseasonably wet weather when indicators
> such as puddles in the road and/or water running in the
> ditchlines indicate an unacceptable increase in the
> likelihood of spreading [PL] and increased likelihood
> of spread cannot be mitigated.

Id.  Plaintiffs interpret these provisions as prohibiting all
activities outside of the dry season except during unseasonably
dry periods.  Plaintiffs submitted weather data apparently to
prove that defendants and intervenors conducted activities
outside of the dry season during periods of seasonably wet
weather.  The Service and intervenors contend that the foregoing
provisions do not bar all activities in wet weather when the risk
of spreading PL can be adequately mitigated.

Read literally, the language in the FEIS permits wet weather
operations during the normal operating period when the risk of
spreading PL can be mitigated, but permits operations during the
wet season only when unseasonably dry conditions exist,

---

[2]Mitigation measures described in chapter two include (1)
restricting operations during the wet season and wet weather, (2)
conducting harvest operations in uninfested areas within a sub-
drainage or road system prior to conducting such operations in an
infected area, (3) washing vehicles and equipment before entry to
and exit from certain areas when certain conditions exist, (4)
restricting access to travel routes and parking areas, (5)
restricting use of quarries within riparian reserves and infected
areas during wet season and wet weather, and (6) planting PL-
resistant POC.  FEIS II-50.

regardless of whether such activities risk spreading PL and whether such risk can be mitigated. There is, however, no need to read these provisions as if attempting to ascertain the intent of Congress from a duly enacted statute. It is reasonable to presume that risks which can be mitigated during unseasonably wet weather during the dry season can also be mitigated during wet or unseasonably dry weather during the wet season. This interpretation comports with Link's statement indicating that wet season activities on the SNF are not unusual. The FEIS indicates that particular control strategies will be developed in response to ongoing re-mapping of sites with surviving POC, and that mitigation measures are selected according to site-specific conditions. III-148, 152. Depending on characteristics, different locations on this large project will be impacted differently by weather and will require different mitigation measures and restrictions. The Service is in the best position to determine the appropriate restrictions and mitigation measures based on local conditions.

The Service has issued "waivers" permitting intervenors to operate in the wet season subject to certain restrictions depending on the weather and activity involved. See e.g. Pl's Ex. 13 (Flattop), Defs' Ex. I (Fiddler). The Fiddler waiver permits wet season activities, subject to restrictions, notwithstanding that one aspect of the sample Fiddler disease

11 - ORDER

control prescription is to limit operations to the drier months.[3]
This discrepancy troubles plaintiffs more than the court. First,
the disease control prescription appears to be a sample only.
Second, the court is deferential to factual matters within an
agency's scientific expertise. Marsh v. Oregon Natural Resources
Defense Council, 490 U.S. 360, 377 (1998). The 2004 POC FSEIS is
not here challenged. The menu of mitigation measures from which
the Service selects derives from this document, and the Service
is in the best position to determine which measures should be
applied to a given sale considering the presence of factors
identified in the FEIS.

The court finds little evidence that the Service and
intervenors have ignored or violated wet season restrictions
which the Service has imposed. Based on this record, the court
preliminarily concludes that wet season activities are not so at
variance with activities contemplated by the FEIS so as to render
the analysis in the FEIS for POC and PL legally deficient.
Plaintiffs have not raised serious questions or demonstrated
probable success on this claim.

b. Tier 1 Key Watersheds

Plaintiffs argue that the FEIS does not adequately discuss
impacts to tier 1 key watersheds. The FEIS identifies and

_____

[3]For example, waivers for the Flattop and Fiddler sales do
not prohibit felling and yarding operations in wet weather, but
vehicle washing restrictions apply. Pls' Ex. A; Defs' Ex. I.

thoroughly discusses tier 1 key watersheds within the project area. FEIS III-202. 210-13, 217-225. It then estimates and discusses effects of the various alternatives in these and other watersheds on channel morphology, fine sediment delivery, peak flow, large wood recruitment, stream temperature and cumulative effects. FEIS III-227-68. Plaintiffs have not raised serious questions or demonstrated probable success on this claim.

c. Fish and Aquatic Habitat

Plaintiffs argue that the FEIS does not disclose the direct, indirect and cumulative effects of project activities on fish and aquatic habitat despite the presence of four protected or sensitive status native fish species, especially because the FEIS contemplates restrictions on wet season activities.

The FEIS discloses that logging and hauling causes sediment delivery to streams through compaction and erosion. FEIS III-85, 259. Plaintiffs cite to the declaration of consulting hydrologist Jonathon Rhodes for the proposition that hauling logs on muddy, potholed roads "will increase sediment and erosion two to five times more than dry season logging."[4] Rhodes Decl. at 3. In related cases, the court held that plaintiffs were not likely to prevail on their claims that the Service did not adequately analyze impacts on sedimentation from road use and fire lines,

---

[4]The plaintiffs in SREP v. Goodman, 04-3058-CO also filed a declaration of this witness. Rhodes incorporates that declaration by reference. Rhodes Decl., at 1.

13 - ORDER

and that the Service did not impermissibly segment the water
quality analysis. SREP v. Goodman, 04-3058-CO, Order dated
August 3, 2004 at 22-23.

Based on the paucity of evidence that intervenors are
hauling logs during conditions not contemplated in the FEIS, the
court finds that plaintiffs have not raised serious questions or
demonstrated probable success on this claim.

d.  Wild and Scenic Rivers

Plaintiffs argue that the Service did not adequately analyze
probable impacts on Wild and Scenic Rivers (WSRs) and rivers
eligible for designation under the Wild and Scenic Rivers Act
(WSRA).  The FEIS discusses environmental consequences to
designated and eligible rivers, and elsewhere analyzes project
impacts on water quality.  FEIS III-322-30.  The analysis
discloses that nine and two FMZs would be constructed in the
Illinois and Chetco WSR corridors, respectively, large salvage
areas are adjacent to the Illinois WSR corridor and some salvage
harvest areas are located near the North Fork Smith WSR corridor.
FEIS III-326.  No salvage activity is planned within any WSR
corridor.  Salvage is planned within several eligible river
corridors, but the FEIS contains a reasoned discussion on effects
on WSR values in these corridors.  FEIS III-328-30.  For
alternative 7, the FEIS states that mitigation measures would
protect the water quality and ORVs of the Illinois, Chetco and

14 - ORDER

North Fork Smith Rivers.  FEIS III-326.

Plaintiffs argue that the FEIS fails to disclose that 90% of planned logging will occur adjacent to the Illinois WSR corridor, and that the ORVs of that river are therefore in jeopardy. Plaintiff's map appears to demonstrate significant logging within the watershed.  See Ex. to Fernandez Decl.  As no logging is planned in the Illinois River corridor, water quality issue is the primary issue presented.  The FEIS devotes over 100 pages and two appendices to a discussion of effects on water quality.  The analysis includes quantitative estimates and concludes that while fine sediment will increase over the short term in certain locations, effects will not be detectable at the watershed level. FEIS III-260.  The Service points to a letter from EPA concluding, based on the FEIS, that the project will improve water quality over the long term.  Ex. K.  EPA was critical of an earlier version of the project described in the DEIS, but its criticisms were satisfied by project modifications reflected in the FEIS.  Id.

With respect to visual WSR values, the FEIS states that so much standing and dead wood would be retained that most people would not know that salvage harvest had occurred.  FEIS III-328- 29.  Salvage harvest boundaries would be irregular and blend with unharvested areas.  Id.  Stumps would rapidly be covered by vegetation and will rot within approximately three decades.  Id.

15 - ORDER

In the short term, cutting and helicopter logging will be visible and audible. Id. No increase in turbidity in any eligible river is expected due to 175 foot riparian buffers. Id.

Consistent with the ruling in the related cases, the court finds that plaintiffs have not demonstrated serious questions or a probable success on their argument that the Service did not adequately consider project effects on WSRs and WSR values.

2. Consideration of Opposing Scientific Information

Plaintiffs argue that the Service violated NEPA by failing to disclose and analyze scientific evidence that planned salvage logging will increase the risk of catastrophic fire in contravention of the stated purpose and need for the project to reduce fuel for wildfires. Plaintiffs ignore another stated purpose and need for the project, the recovery of burned timber with economic value. FEIS I-8. The court is likely to ultimately conclude that the former need is served by planned fuels treatments, while the latter is addressed by planned salvage logging.

Citing to the declaration of research biologist Dr. Dennis Odion, plaintiffs fault the Service for not disclosing and addressing scientific evidence that small diameter materials generated by logging (slash) increase the possibility and intensity of future fires. Dr. Odion states that salvage logging will generate tons of slash which will be readily available as

16 - ORDER

ground fuel. Odion Decl. at 1-3; FEIS Appx. B-51. Odion also
states that material in excess of 8" diameter does not contribute
to fire intensity and detrimental fire effects. Odion Decl., ¶
8.

Plaintiffs do not address planned fuels mitigation measures
common to all alternatives, or the Service's plan to treat
activity fuels generated by logging with jackpot burning,
broadcast burning, underburning, and handpiling and burning.
FEIS II-48. Nor do plaintiffs address tables in the errata sheet
which appear to indicate that after planned slash treatments,
only large materials will remain, which plaintiff's evidence
suggests do not appreciably increase fire risk. Pls' Ex. 1. The
court finds that plaintiffs have not demonstrated serious
questions or probable success with respect to their argument that
the Service failed to disclose important scientific information
regarding increased fire risk attributable to salvage logging.

3. Site-Specific Soil Surveys

Plaintiffs next argue that the Service violated NEPA by
failing to conduct ground-based, site-specific soil surveys to
ensure compliance with SNF LRMP soil protection guideline 7-2.
The guideline states that detrimental soil conditions should not
exceed 15 percent of the total acreage within the activity area,
including roads and landings. Pls' Ex. 6, SNF LRMP IV-44. The
Service estimated present conditions, site productivity and

sediment yield from aerial photography, GIS maps, modeling tools, monitoring reports from the 1987 Silver fire, ecology and erosion plots, and watershed analyses. FEIS III-74-75.

In Lands Council v. Powell, 395 F.3d 1019, 1035 (9th Cir. 2005), the court held that the Service violated NFMA by not ensuring the accuracy of its model-based estimates of detrimental soil conditions with on-site verification on the 1,408 acre timber harvest component of a larger watershed restoration project on the Idaho Panhandle National Forest. The court agreed with the reasoning in Kettle Range Conservation Group v. United States Forest Svc., 148 F.Supp.2d 1107, 1127 (E.D.Wash. 2001), where the district court found a NEPA violation under similar circumstances. Id. at 1034-35. Thus, although Lands Council involved a NFMA violation, the case is apparently relevant to the resolution of plaintiff's NEPA claim regarding guideline 7-2.

The methodology employed by the Service on the Biscuit Project appears more robust than that used to estimate soil conditions for the Iron Honey Project at issue in the Lands Council case. In the latter instance, the Service relied on aerial photography and little or no testing of soils in the activity area. For the Biscuit Project, the Service conducted soil investigations on five burned areas, in addition to "informal monitoring efforts" involving 40 aerial mulching study plots and 260 erosion plots. FEIS III-75, App. C-4, 11. Based

on this information and other sources mentioned above, the
Service estimated the effects of alternatives on soil
displacement and compaction in different watersheds. FEIS III-
74-75, 94, 99. By March, 2004, surveyors had visited thirty
percent of the proposed harvest units. FEIS III-83. In contrast
to the projects at issue in Lands Council and Kettle Range, the
Service in this case walked and surveyed a significant portion of
the activity area prior to completing the NEPA analysis for
soils. Cf. Lands Council, 395 F.3d at 1034. The Service uses
survey information to determine appropriate yarding, mitigation
and monitoring systems based on site-specific conditions. FEIS
III-83; Ex. Q. Surveys conducted on these visits document, inter
alia, percentages of compacted and displaced soil and burn
severity, aspects of detrimental soil conditions as defined by
the guideline. Ex. Q; SNF LRMP IV-44. Collected information is
maintained in an "access database" on file at the Gold Beach
Ranger District.[5]  FEIS III-83.

The Biscuit Project may be further distinguished from the
Iron Honey Project at issue in Lands Council. The former
involves salvage harvest of dead trees, whereas the latter called

---

[5]The administrative record has not yet been filed in this
case. The results of surveys relied on by the Service in its
decision-making have the potential to become part of the
administrative record. See Southwest Ctr., 100 F.3d at 1450.
Completed survey forms are presumably available to the public by
request under the Freedom of Information Act.

19 - ORDER

for shelterwood harvest that would have removed seventy percent of the canopy in areas slated for logging. Lands Council, 395 F.3d at 1025, n.4. Compaction may be less of a concern than on the Iron Honey Project, as only 2,131 of 19,465 acres of planned harvest areas were previously managed on the Biscuit Project. In contrast, the Iron Honey Project sought to remedy past environmental degradation resulting from intense logging on 40,000 acres of the Little North Fork watershed since 1960. The salvage logging component of the Biscuit Project also eclipses the timber harvest component of the Iron Honey Project in geographic scale by a ratio of approximately 14:1 (19,465 acres:1,408 acres). At some point, it may become impractical to complete all unit surveys prior to preparation of an EIS, and to include all of the information collected in the EIS.

Considering the size of the salvage harvest component of the Biscuit Project, the limited extent of previous logging activities, and the methodology employed by the Service, which included on-site unit surveys prior to publication of the FEIS, the court finds that plaintiffs have not raised serious questions or demonstrated probable success on their claim that the Service violated NEPA by failing to conduct soil surveys to insure compliance with SNF LRMP guideline 7-2.

4. Scientific Integrity of Decision Making - "DecAID"

Plaintiff's claim the Service's use of the "Decayed Wood

Advisor for Managing Snags, Partially Dead Trees and Down Wood
for Biodiversity in Forests of Washington and Oregon" (DecAID)
violates the requirement that the Service insure the professional
and scientific integrity of the discussions and analyses in
environmental impact statements. See 40 C.F.R. § 1502.24.
Plaintiffs argue that the use of DecAID is arbitrary and
statistically meaningless because DecAID treats the complex
project area as if it were of a single forest type, DecAID does
not assess wildlife population viability, the data within DecAID
is from unburned forests, and DecAID has limited data regarding
dead wood needs of different animals in southwestern Oregon.

Although the FEIS states that DecAID provides excellent
information for management of dead wood, and quotes statements
from DecAID regarding decay rates for down wood, the FEIS
expressly states that "[s]nag and down wood prescriptions for the
Biscuit Fire Recovery area have been developed based on site-
specific data generally collected within the Biscuit Fire area."
FEIS App. G-3-4. The FEIS thus contradicts the notion that the
Service used DecAID to any great extent to determine the amount
and kind of large wood, trees and snags to retain. The dead wood
prescription within appendix G appears to disclose the
methodology employed by the Service, as required by 40 C.F.R. §
1502.24. The FEIS cites DecAID among many sources of
information. FEIS App. G.

As there is no evidence the Service relied heavily on DecAID in devising the snag retention scheme, the court finds at this time that plaintiffs have not raised serious questions or demonstrated probable success on this claim.

B.   NFMA Claims

1.   Site-Specific Soil Surveys

Citing again to Lands Council, plaintiffs claim that the Service's failure to verify compliance with SNF LRMP Guideline 7-2 with on-site soil surveys violates NFMA. Pls' Memo. at 38-39. As discussed in the context of plaintiffs' NEPA argument, the court finds Land Council distinguishable. Plaintiffs have not raised serious questions or demonstrated probable success on this claim.

2.   Violation of Standards for Management Area 8

Plaintiffs argue that planned salvage logging in management area 8 (MA-8) violates the SNF LRMP. It appears undisputed that the MA-8 designated areas at issue are overlapped by the NWFP's LSR system. The 1995 "Reconciliation Document" states that where an LSR overlaps an MA-8 area, the MA-8 area becomes LSR and is thereafter subject to standards and guidelines applicable to LSRs. Defs' Ex. O, RD-5. Because the guidelines for MA-8 areas do not appear to apply to the LSR salvage logging component of the Biscuit Project, plaintiffs have not raised serious questions or demonstrated probable success on their NFMA claim premised

upon violations of MA-8 guidelines.[6]

        3.   LRMP Standards for Snag Retention

According to plaintiffs, the FEIS discloses that the Service is not meeting requirements to retain sufficient snags within each harvest unit to provide "100% habitat capability for black-backed and white-headed woodpeckers, flamulated owl, and pygmy nuthatch." The FEIS states,

> It is not necessary to retain 60% habitat capability for snag associated species in salvage areas, as described for snag retention in matrix (NWFP, p. C-41; Siskiyou LRMP, p. IV-34; NWFP, p. A-2), because these retention requirements can be applied at a one hundred acre scale (Siskiyou LRMP p. IV-34), which, in this project, generally includes about fifty percent of areas where salvage is not proposed, primarily due to protection measures for Riparian Reserves.

FEIS Appx. G-22.

Standard and guideline 4-13a of the 1989 SNF LRMP states that habitat capability for woodpeckers should be maintained at not less than 60% of potential population levels. SNF LRMP IV-33. The March, 2004 Guidelines in Management Planning Documents Within the Range of the Northern Spotted Owl (2004 Guidelines ROD) states that the white-headed woodpecker, black-backed woodpecker, pygmy nuthatch, and flammulated owl will not be sufficiently aided by elements of the NWFP. 2004 Guidelines ROD

---

[6]In related cases, the court previously indicated that it was likely to ultimately conclude that the planned LSR salvage logging complies with NWFP LSR salvage guidelines. <u>Siskiyou Regional Education Project (SREP) v. Goodman</u>, 04-3058-CO, Order dated August 23, 2004 at 14.

at 35. The 2004 Guidelines ROD states that in the matrix outside riparian reserves and designated spotted owl habitat, "snags over 20" dbh may be marked for cutting only after retaining the best available snags (considering size, longevity, etc.) in sufficient numbers to meet 100 percent of potential population levels of these four species." Id. The ROD goes on to state that for white-headed woodpeckers, the management recommendation in forest habitat is to retain .60 conifer snags at least 15" dbh per acre, and that this level of snag retention should also provide for flammulated owls. Id. at 36. According to the Service, only the white-headed woodpecker is known to nest on the SNF, although the Service considered the potential of the other species to nest on the SNF. The black-backed woodpecker and pygmy nuthatch do not occur west of the Cascade Range. Id.

Without conceding that 100% population potential is the proper standard, the Service argues that the standard is satisfied, noting that 1.5 to 13.5 snags > 20 inch dbh per acre will be retained, whereas the 2004 Guidelines prescribe retention of .60 snags > 15 inch dbh per acre for 100 percent population potential. FEIS III-185, App G-20-22; Pls' Ex. 5 at 36.

Plaintiffs argue that these totals wrongly include snags within riparian reserves. The Service responds that under the guideline cited by plaintiff, only live trees within riparian reserves may not be counted. The cited guideline states,

> Wildlife trees designated in riparian areas may be
> counted towards snag objectives only if they are excess
> to those needed to provide shade in stream corridors
> (essential shade trees cannot be killed to provide snag
> habitat).

SNF LRMP IV-34. The text also refers to wildlife trees which
will continue to grow for another 30-35 years. Id. The Service
thus appears to be correct that the guideline refers to live
trees and prohibits killing essential shade trees for wildlife
purposes in riparian areas, and does not necessarily prohibit
counting dead trees. Here, the trees to be cut are already dead
and no riparian trees will be cut.

As plaintiffs have not demonstrated that dead trees may not
be counted toward the standard, and plaintiffs' preferred
standard appears to be satisfied, the court finds that plaintiffs
have not demonstrated serious questions or probable success on
this claim.

### 4. Viability of Indicator Species

Plaintiffs argue that the Service violated NFMA when it
utilized the allegedly flawed DecAID modeling device to determine
habitat conditions necessary to insure viable populations of
primary cavity excavators (PCEs), SNF LRMP management indicator
species (MIS). "NFMA requires that the Forest Service identify
Indicator Species, monitor their population trends, and evaluate
each project alternative in terms of the impact on both Indicator
Species habitat and Indicator Species populations." Lands

<u>Council</u>, 395 F.3d at 1036. Where the methodology for identifying
habitat is sound, the Ninth Circuit has permitted the Service to
assess habitat as a proxy for population trends. <u>Lands Council</u>,
<u>supra</u>; <u>Cf</u>: <u>Idaho Sporting Congress v. Rittenhouse</u>, 305 F.3d 957,
971-74 (9th Cir. 2002) ("proxy-on-proxy" approach not permitted
where methodology did not accurately identify habitat and Forest
Service wildlife expert stated in EA that old-growth habitat
could not be used as proxy for pileated woodpecker habitat)."[7]

As noted, plaintiffs have not established that the Service
relied on DecAID to a significant extent, and the FEIS seems to
indicate otherwise. Importantly, the Service utilized site-
specific information collected within the fire area, including
information for 35 plant association groups (PAGs), in designing
the snag and down wood prescription. FEIS App. G-3-4.

---

[7]On January 5, 2005, the Department of Agriculture repealed
regulations governing monitoring of MIS populations. The parties
dispute whether the repeal has retroactive effect. Defendants
cite to <u>Southwest Ctr. for Biological Diversity v. United States
Dept. of Agriculture</u>, 314 F.3d 1060, 1061 (9th Cir. 2002), where
the court held that an intervening statute barring the plaintiffs
from obtaining a document formerly available under the Freedom of
Information Act had no impermissible retroactive effect. The
case is not on point. Repeal of the old regulations alters
substantive requirements governing the manner in which the
Service monitors MIS populations. Absent an unambiguous
statement from the department that the new regulations should be
applied retroactively, retroactive application is impermissible.
See <u>Landsgraf v. USI Film Products</u>, 511 U.S. 244, 280 (1944); <u>see
also</u> <u>Utah Envtl. Congress v. Bosworth</u>, 372 F.3d 1219, 1221 n.1.
(10th Cir. 2004) (applying regulations in effect at time of
agency decision, and vacating timber sales for insufficient MIS
data). The 2004 regulations apply to this project.

Plaintiffs argue that because the Service concluded that woodpecker populations will decline after approximately 20 years when snags start falling in significant numbers, the Service cannot now authorize any snags for harvest, in light of the requirement in the 2004 Guidelines ROD to retain snags in sufficient numbers to maintain 100 percent population potential of PCEs.

The FEIS states that as a result of the large number of snags created by the fire, woodpecker populations will increase dramatically for 10-20 years, an increase that is only slightly lessened by the relatively small number of snags that would be removed under the action alternatives. FEIS Appx. E-34. Thereafter, populations will continue to decline as snags naturally fall, though large snags will persist. Id. This decline will occur under all alternatives, including the no-action alternative, and reach a point lower than pre-fire levels. Id. As late-successional forest stands develop, it is expected that populations of woodpeckers will again increase until reaching near pre-fire levels. Id. "Creation of FMZs and prescribed burning, while they may reduce snags in the immediate area are thought to better protect such habitats in the long-term." Id. at 35.

Table III-64 reports that effects on woodpeckers will be minimal, that is, only some individuals will be affected. FEIS

27 - ORDER

III-192-93. The FEIS discloses the number of known white-headed woodpecker sites in the fire area. FEIS III-162. As noted, the 2004 Guidelines ROD guidelines appear to be satisfied for the white-headed woodpecker.

Based on the foregoing, the court does not find serious questions or probable success for plaintiffs on their argument that the Service violated NFMA by relying on habitat as a proxy to ensure viability of PCEs.

C. ARA Claims

Plaintiffs have not addressed their ARA claims.

As noted throughout this portion of the opinion, the court finds that plaintiffs have not demonstrated the existence of serious questions or probable success on the merits of their claims.

## II. Balance of Equities

Plaintiffs argue that irreparable harm to their interests is imminent, because ongoing wet season logging will continue to harm fish, POC, soils and Wild and Scenic River qualities. Plaintiffs submitted several declarations of scientists in support of this argument. To the extent the argument is based upon wet weather log hauling, the force of the argument is diminished by the paucity of evidence that wet weather log hauling is occurring. While it is frequently said that environmental harm is by its nature irreparable, it seems to the

28 - ORDER

court that the degree of harm associated with harvesting dead
trees may be somewhat less than that associated with the removal
of live mature trees. As discussed above, snags may begin
falling in large numbers in twenty years. It is also noteworthy
that the Service's scientists mostly disagree with plaintiff's
evidence that the project will significantly affect fish, soils,
POC and Wild and Scenic River qualities over the long term.

On the other side of the equation, the court noted in the
related cases the Service's findings that delay of further
project implementation will result in deterioration of
merchantable timber and loss of economic value. See SREP, 04-
3058, Order dated August 3, 2004 at 31. Service Contracting
Officer Link stated in his declaration that additional delay will
add to these losses. Link Decl., ¶ 11. At the hearing on March
29, 2005, Virgil Frazier of CLR Timber testified that as of that
date, between four and five million board feet of timber,
possibly valued at $2.5 million, was on the ground on the Steed
timber sale, with helicopter yarding expected to commence on
March 31, 2005. John West of Silver Creek estimated there was
between seven and eight million board feet on the ground at the
Fiddler sale as of the hearing date. West put the value of this
timber between $4 million and $4.5 million, and stated he planned
to commence helicopter yarding on April 4, 2005. As noted in the
order denying plaintiff's motion for temporary restraining order,

29 - ORDER

intervenors submitted evidence that Silver Creek will lose contractors and $190,000 per week in revenue if the Fiddler sale is enjoined. West Decl. West estimates his contractors would lose $332,500 per week in revenue. Id. West Decl. Max Merlich of Columbia Helicopters, Inc. estimates that his company stands to earn $40,000 per day for helicopter yarding in conjunction with the Fiddler sale. Merlich Decl.

The court has previously noted that the public's interest in the project appears fractured, and that opposition is vocal. For public safety, the Service issued road and area closures for the Fiddler sale on March 14 and 15, 2005, respectively. Despite the vocal opposition, the Service is the agency charged with managing the Forests, and it has identified permissible purposes and needs for the project. The extent of public support for the project is not disclosed on this record.

III. Application of Sliding Scale

Considering the likelihood plaintiffs will succeed on the merits, the harm that will result from granting or withholding the requested injunction, and what the court can discern of the public interest, the court finds that an injunction is not warranted in this case at this time.

Conclusion

Based on the foregoing, plaintiff's motion for preliminary injunction [#9] is denied; plaintiff's motion for bond waiver

[#11] is denied as moot.

IT IS SO ORDERED.

DATED this _____ day of April, 2005.

_____
United States District Judge