IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF OREGON

CASCADIA WILDLANDS PROJECT,         Civil No. 04-6440-TC
et al.,

                                    Order

            Plaintiffs,

            v.

SCOTT CONROY, Rogue River-
Siskiyou National Forest
Supervisor, et al.,

            Defendants.

    The complaint seeks declaratory and injunctive relief for
alleged violations of the National Forest Management Act (NFMA),
the National Environmental Policy Act (NEPA) and the Appeals
Reform Act (ARA). Plaintiffs' claims arise from defendants'
decision to implement the Biscuit Fire Recovery Project. Before
the court are the parties' motions for summary judgment and
motions to strike extra-record evidence. For the reasons
explained below, the court concludes that defendants did not
violate NFMA and NEPA in planning and implementing the Biscuit

Project.  Further, plaintiffs abandoned claims not addressed in the summary judgment briefing, including plaintiffs' ARA claims and certain NFMA and NEPA claims.  Plaintiffs' motion for summary judgment is denied; defendants' motion for summary judgment is granted; plaintiffs' motion to strike is granted in part; and defendants' oral motion to strike is denied.

## Background

The Biscuit Project is the response of the Forest Service and the Bureau of Land Management (BLM) to a 2002 wildfire that burned millions of trees on nearly 500,000 acres, primarily on the Siskiyou National Forest (SNF).  The Service describes the project as among the largest and most complex in its history. Twenty-three regional and national fire management teams contributed to fire suppression efforts.  Seven thousand firefighters and support people were deployed during the peak of the blaze.  The affected area includes nearly all of the Kalmiopsis Wilderness Area, 164,923 acres in late-successional reserves (LSRs), 3,428 acres in Wild and Scenic River Corridors, and approximately 188,000 acres in inventoried roadless areas (IRAs).  The Kalmiopsis Wilderness Area is well-known as a repository for rare plants, and the Siskiyou National Forest as a whole is similarly renowned for its diversity of plant life. FEIS III-113.

Following fire suppression activities, resource specialists

2 - ORDER

analyzed impacts through aerial photography and field
reconnaissance.  In December, 2002, and January, 2003, the
Service held ten public meetings to gather input from residents
of affected communities concerning desired treatments and
options.  On January 30, 2003, the Service published the Biscuit
Post-Fire Assessment, setting forth options for moving toward
desired conditions.  The Service identified needs to recover
economic value from burned timber, reduce risk to nearby
communities and forest resources from future high intensity fire,
and revegetate burned conifer stands and other burned plant and
animal habitats.  FEIS I-1-6.

The Service issued a draft environmental impact statement
(DEIS) on November 23, 2003, triggering a public comment period
that ended on January 20, 2004, after a fifteen-day extension.
The Service received more than 23,000 comments.  In December,
2003, the Service held five more public meetings to explain the
DEIS.  Approximately 400 people attended these meetings.
Thereafter, the Service issued a two-volume, Final EIS (FEIS)
approximately 1,000 pages in length (including appendices), in
which the Service considered seven alternative responses to the
fire.

On July 8, 2004, Rogue River-Siskiyou National Forest
Supervisor Scott Conroy issued the LSR and Matrix RODs,
authorizing activities in LSRs and matrix lands outside of IRAs.

3 - ORDER

These RODs and two others implement with modification the action described in the FEIS as alternative 7. "Alternative 7 was broken down into four RODs in recognition of legal responsibilities and differing land management objectives." LSR ROD at 1. The RODs not implicated in this case authorize activities on Forest Service lands within IRAs and on lands managed by the Bureau of Land Management. Id.

With the LSR ROD, Conroy decided to "select 6,305 acres of salvage harvest on LSR lands, create 52 miles of Priority 2 fuel management zones (FMZs), plant 12,700 acres of burned conifer stands and associated riparian reserves, seed 1,630 acres of meadows and savannas, reduce tree encroachment on 590 acres of meadow, maintain 200 miles of road build, and, subsequent to use, decommission 1.3 miles of temporary road and road realignments." LSR ROD at 2. The LSR ROD authorizes roughly 113 million board feet (mmbf) of salvage timber harvest. Of this quantity, 54.4 mmbf is covered by Regional Forester Linda Goodman's June 3, 2004 emergency situation determination (ESD). The ESD exempts the challenged timber sales from the automatic stay normally triggered by the filing of an administrative appeal, based on Goodman's finding that delaying implementation of the sales would result in substantial economic loss to the federal government. Salvage logging subject to the ESD is slated to occur on one half of one percent of the recovery area, and 1.5% of LSRs within the

4 - ORDER

recovery area.

With the Matrix ROD, Conroy decided to select 4,460 acres of salvage harvest on matrix lands, create 67 miles of FMZs, plant 8,400 acres of burned conifer stands and associated riparian reserves, seed 400 acres of meadows and savannas, reduce tree encroachment on 100 acres of meadow, close 18 miles of road, decommission 10 miles of road, stabilize 37 miles of road, maintain 300 miles of road build, and, subsequent to use, decommission 1 mile of temporary road and perform 4 road realignments.  Matrix Rod at 2.

Under alternative 7, only dead trees would be salvage harvested.  FEIS II-35.  The FEIS defines dead trees as trees with no green needles or leaves.  Id.

The complaint asks for declaratory relief and an injunction prohibiting defendants from awarding timber sales or conducting or permitting ground-disturbing activities in LSRs until defendants comply with NFMA, NEPA and ARA.  Complaint at 48.

This is the fifth case filed in this district challenging the July 8, 2004 RODs.

<u>Discussion</u>

I.  <u>Standards</u>

Summary judgment is appropriate if there are no disputed issues of material fact and the moving party is entitled to judgment as a matter of law.  Fed.R.Civ.P. 56(c).  Ordinarily,

when agency action is challenged there are no disputed issues of fact.  Summary judgment is simply the mechanism used to present the court with the question of whether the agency could reasonably have found the facts as it did, considering the record before the agency.  <u>Occidental Eng'g Co., v. Immigration & Naturalization Svc.</u>, 753 F.2d 766, 769-70 (1985).

NEPA and NFMA claims are reviewable under provisions of the Administrative Procedure Act (APA).  <u>Ecology Ctr., Inc. v. Austin</u>, 430 F.3d 1057, 1062 (9th Cir. 2005).  A reviewing court must compel agency action unlawfully withheld or unreasonably delayed, and hold unlawful and set aside agency action, findings, and conclusions found to be, <u>inter alia</u>, arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law, in excess of statutory authority or limitations, or short of statutory right, or without observance of procedure required by law.  5 U.S.C. § 706.  APA review ordinarily focuses on the administrative record at the time of an agency's decision, not a record created in the reviewing court.  <u>Southwest Ctr. for Biological Diversity v. United States Forest Svc.</u>, 100 F.3d 1443, 1450 (9th Cir. 1996).

"NEPA requires that a federal agency consider every significant aspect of the environmental impact of a proposed action ... [and] inform the public that it has indeed considered environmental concerns in its decisionmaking process."  <u>Earth</u>

6 - ORDER

Island Inst. v. United States Forest Serv., 351 F.3d 1291, 1300
(9th Cir.2003) (internal quotation marks omitted).  "In order to
accomplish this, NEPA imposes procedural requirements designed to
force agencies to take a 'hard look' at environmental
consequences."  Id.  NFMA requires that contracts for the use and
occupancy of National Forest System Lands be consistent with
applicable land management plans.  16 U.S.C. § 1604(I).

II.  Extra-record Evidence

     Plaintiffs and defendants filed extra-record evidence.
Plaintiffs filed a motion to strike defendants' extra-record
evidence.  At oral argument, defendants made an oral motion to
strike plaintiffs' extra-record evidence.

     Plaintiffs' extra-record evidence consists of the
declarations of scientists and documentary evidence of project
activities and weather conditions.  Not all of plaintiffs'
evidence is admissible.  Evidence of weather conditions and
project activities is relevant and admissible with respect to
plaintiffs' NEPA claims that defendants are not complying with
mitigation measures and failed to consider that project
activities will take place in wet weather.  See Southwest Ctr.,
100 F.3d at 1450; Tyler v. Cisneros, 136 F.3d 603, 608 (9th Cir.
1998).  Scientific evidence may be admissible to prove that the
Service failed to consider important aspects or effects of the
project.  Southwest Ctr., 100 F.3d at 1450.  Plaintiffs'

scientific evidence is unnecessary in this case for the court to understand technical or scientific terms or subject matter. Id. The court need not definitively resolve the admissibility of plaintiffs' scientific evidence, in any event. The court has considered this evidence. At most, the evidence demonstrates that plaintiffs' experts disagree with the Service's scientific conclusions. The evidence does not demonstrate that the Service failed to consider important aspects of the Biscuit Project. The court defers to the Service's well-considered scientific conclusions on matters of forest management. Marsh v. Oregon Natural Resources Defense Council, 490 U.S. 360, 377 (1998). Defendants' oral motion to strike plaintiffs' extra-record evidence is denied.

Plaintiffs ask the court to strike the declaration of Biscuit Project Contracting Officer Thomas Link, and Exhibit Q, which consists of harvest unit soil surveys. Portions of the Link declaration and exhibits thereto rebut plaintiffs' evidence of weather conditions and project activities, while other portions of the declaration simply traverse the FEIS.[1]  Although the court declines to strike the Link declaration, the court considers only the portions of the Link declaration that rebut plaintiffs' evidence of weather conditions and project

---

[1]Still other portions of the declaration discuss matters relevant to plaintiffs' motion for a preliminary injunction.

activities.

Exhibit Q consists of harvest unit soil quality surveys conducted before and after publication of the FEIS. Post-publication surveys are irrelevant. Pre-publication surveys are arguably relevant to rebut plaintiffs' assertion that the Service did not visit proposed harvest units prior to publication of the FEIS. In any event, the court can resolve plaintiffs' claims without the exhibit. The FEIS discloses that the Service conducted field reviews of 30 percent of proposed harvest units as of March 2004, prior to publication of the FEIS in June 2004, and that the information collected is contained in an access database on file at the Gold Beach Ranger District. FEIS III-83. In an abundance of caution, plaintiffs' motion to strike is granted with respect to exhibit Q.

III.   NEPA Claims

A.   Analysis of Environmental Effects

Plaintiffs first argue that the Service failed to adequately consider and/or disclose environmental consequences of the project, especially impacts from wet-season logging and hauling on Port Orford Cedar trees (POC), tier 1 key watersheds, fish and aquatic habitat, and designated and eligible Wild and Scenic Rivers (WSRs).

1.   Port Orford Cedar

Plaintiffs contend the Service failed to adequately

consider cumulative and site-specific impacts on POC and the spread of Phytophera lateralis (PL), a root disease usually fatal to POC.  Plaintiffs argue that wet season and wet weather logging pose great risk of spreading PL, and that the FEIS assumes that wet season and wet weather activities will not take place, or that mitigation measures will be followed.  Plaintiffs contend that intervenors are conducting wet season and wet weather activities without following required mitigation measures.

     To the extent plaintiffs fault the FEIS generally for not adequately discussing project impacts on POC and the spread of PL, the court rejects the claim.  The FEIS tiers to the 2004 Port Orford Cedar Final Supplemental Environmental Impact Statement - Management of Port-Orford-Cedar in Southwest Oregon (2004 POC FSEIS).  The 2004 POC FSEIS is the response of the Service and the BLM to NEPA violations identified in <u>Kern v. Bureau of Land Management</u>, 284 F.3d 1062 (9th Cir. 2002).  Plaintiffs do not appear to argue that the 2004 POC FSEIS lacks a sufficient analysis of environmental effects so as to render tiering impermissible.  Further, the Service designed its mitigation measures under the assumption that uninfected POC is present and worthy of protection in sale areas.  FEIS III-149.  Plaintiffs complain that the Service did not survey all units for POC prior to publication of the FEIS.  Had defendants completed such surveys, the result may well have been fewer POC protections for

units without POC.

Plaintiffs specifically maintain that the Service and intervenors are not adhering to required seasonal and wet weather activity prohibitions and vehicle washing requirements.

To prove the alleged violations of required mitigation measures, plaintiffs submitted photographs of wet Forest roads and vehicles traveling on wet Forest roads, including Road 4201 on the Fiddler LSR timber sale haul route.  Several photos show puddles, water in ditchlines and mud.  See Shelton Decl., Exs., Adams Decl., Exs., Brown Decl., Exs., Sklar Decl., Ex., 2nd Shelton Decl., Exs.  Plaintiffs also submitted photographs of an open gate on Forest Road 4201-141.  2nd Shelton Decl., Photos 1-3.  Finally, plaintiffs submitted weather information downloaded from the internet by counsel for plaintiffs.

John West of Silver Creek Timber Company testified at the preliminary injunction hearing as follows: (1) falling and yarding commenced on the Fiddler sale on March 7, 2005; (2) entry into the sale area was not prohibited prior to that date; (3), Silver Creek first set up a vehicle washing station for the Fiddler sale on March 19, 2005; (4) good weather prevailed in the sale area from March 7-19, 2005; (5) hauling commenced March 22, 2005 when eight loads were hauled in mostly sunny weather, prior to the onset of light showers; (6) five inches of snow fell five miles up the road at the top of the sale area; (7) fallers

11 - ORDER

continued to work in the snow; and (8) West did not observe and
is not aware of log hauling occurring when puddles are present.
SNF Contracting Officer Thomas Link stated in his declaration
that typically 30% of the annual timber harvest on the SNF is
accomplished during fall or winter months.  Link Decl., ¶ 4.

The FEIS lists limiting activities to the dry season
(generally defined as June 1 to September 30) as a mitigation
measure to reduce the spread of PL.[2]  FEIS II-49.  The FEIS
further states,

> Operations may be permitted during periods of
> unseasonably dry weather outside of the normal
> operating period.  Operations will be suspended during
> periods of unseasonably wet weather when indicators
> such as puddles in the road and/or water running in the
> ditchlines indicate an unacceptable increase in the
> likelihood of spreading [PL] and increased likelihood
> of spread cannot be mitigated.

Id.  Plaintiffs interpret these provisions as prohibiting all
activities outside of the dry season except during unseasonably
dry periods.  Plaintiffs submitted weather data apparently to
prove that defendants and intervenors conducted activities
outside of the dry season during periods of seasonally wet

---

[2]Mitigation measures described in chapter two include (1)
restricting operations during the wet season and wet weather, (2)
conducting harvest operations in uninfested areas within a sub-
drainage or road system prior to conducting such operations in an
infected area, (3) washing vehicles and equipment before entry to
and exit from certain areas when certain conditions exist, (4)
restricting access to travel routes and parking areas, (5)
restricting use of quarries within riparian reserves and infected
areas during wet season and wet weather, and (6) planting PL-
resistant POC.  FEIS II-50.

weather.  The Service and intervenors contend that the foregoing provisions do not bar all activities in wet weather when the risk of spreading PL can be adequately mitigated.

The FEIS may be read literally to permit wet weather operations during the normal operating period when the risk of spreading PL can be mitigated, and to permit operations during the wet season only when unseasonably dry conditions exist, regardless of whether such activities risk spreading PL and whether such risk can be mitigated.  This is not the only reasonable interpretation, however.  It is reasonable to presume that risks which can be mitigated during unseasonably wet weather during the dry season can also be mitigated during wet or unseasonably dry weather during the wet season.  This interpretation comports with Link's statement indicating that wet season activities on the SNF are not unusual.  The FEIS indicates that particular control strategies will be developed in response to ongoing re-mapping of sites with surviving POC, and that mitigation measures are selected according to site-specific conditions.  FEIS III-148, 152.  Depending on characteristics, different locations on this large project will be impacted differently by weather and will require different mitigation measures and restrictions.  The Service is in the best position to determine the appropriate restrictions and mitigation measures based on local conditions.

13 - ORDER

The Service has issued "waivers" permitting intervenors to operate in the wet season subject to certain restrictions depending on the weather and activity involved.  See e.g. Pl's Ex. 13 (Flattop), Defs' Ex. I (Fiddler).  The Fiddler waiver permits wet season activities, subject to restrictions, notwithstanding that one aspect of the sample Fiddler disease control prescription is to limit operations to the drier months.[3] This discrepancy troubles plaintiffs more than the court.  First, the disease control prescription appears to be a sample only. Second, the court is deferential to factual matters within an agency's scientific expertise.  Marsh, 490 U.S. at 377.  The 2004 POC FSEIS is not here challenged.  The menu of mitigation measures from which the Service selects derives from this document, and the Service is in the best position to determine which measures should be applied to a given sale considering the presence of factors identified in the FEIS.

The court finds little evidence that the Service and intervenors have ignored or violated wet season restrictions which the Service has imposed.  Based on this record, the court concludes that wet season activities are not so at variance with activities contemplated by the FEIS so as to render the analysis in the FEIS for POC and PL legally deficient.

_____

[3]For example, waivers for the Flattop and Fiddler sales do not prohibit felling and yarding operations in wet weather, but vehicle washing restrictions apply.  Pls' Ex. A; Defs' Ex. I.

14 - ORDER

2.  Tier 1 Key Watersheds

Plaintiffs argue that the FEIS does not adequately discuss impacts to tier 1 key watersheds.  The FEIS identifies and thoroughly discusses tier 1 key watersheds within the project area.  FEIS III-202. 210-13, 217-225.  It then estimates and discusses effects of the various alternatives in these and other watersheds on channel morphology, fine sediment delivery, peak flow, large wood recruitment, stream temperature and cumulative effects.  FEIS III-227-68.

3.  Fish and Aquatic Habitat

Plaintiffs argue that the FEIS does not disclose the direct, indirect and cumulative effects of project activities on fish and aquatic habitat despite the presence of four protected or sensitive status native fish species, especially because the FEIS contemplates restrictions on wet season activities.

The FEIS discloses that logging and hauling causes sediment delivery to streams through compaction and erosion.  FEIS III-85, 259.  The FEIS contains quantified estimates of sedimentation. Plaintiffs cite to the declaration of consulting hydrologist Jonathon Rhodes for the proposition that hauling logs on muddy, potholed roads "will increase sediment and erosion two to five times more than dry season logging."  Rhodes Decl. at 3.  As noted, the court finds little evidence that intervenors are operating during conditions not contemplated in the FEIS.  In

15 - ORDER

related cases, the court denied the plaintiffs' claims that the
Service did not adequately analyze impacts on sedimentation from
road use and fire lines, and that the Service did not
impermissibly segment the water quality analysis.   SREP v.
Goodman, 04-3058-CO, Order dated February 26, 2006.

    4.   Wild and Scenic Rivers

    Plaintiffs argue that the Service did not adequately analyze
probable impacts on Wild and Scenic Rivers (WSRs) and rivers
eligible for designation under the Wild and Scenic Rivers Act
(WSRA).   The FEIS discusses environmental consequences to
designated and eligible rivers, and analyzes project impacts on
water quality.   FEIS III-322-30.   The analysis discloses that
nine and two FMZs would be constructed in the Illinois and Chetco
WSR corridors, respectively, large salvage areas are adjacent to
the Illinois WSR corridor, and some salvage harvest areas are
located near the North Fork Smith WSR corridor.   FEIS III-326.
No salvage activity is planned within any WSR corridor.   Salvage
is planned within several eligible river corridors, but the FEIS
contains a reasoned discussion on effects on WSR values in these
corridors.   FEIS III-328-30.   For alternative 7, the FEIS states
that mitigation measures would protect the water quality and ORVs
of the Illinois, Chetco and North Fork Smith Rivers.   FEIS III-
326.

    Plaintiffs argue that the FEIS fails to disclose that 90% of

16 - ORDER

planned logging will occur adjacent to the Illinois WSR corridor, and that the ORVs of that river are therefore in jeopardy. Plaintiffs' map appears to demonstrate significant logging within the watershed.  See Fernandez Decl., Ex.  As no logging is planned in the Illinois River corridor, water quality is the primary issue presented.  The FEIS devotes over 100 pages and two appendices to a discussion of effects on water quality.  The analysis includes quantitative estimates and concludes that while fine sediment will increase over the short term in certain locations, effects will not be detectable at the watershed level. FEIS III-260.  Although the FEIS does not include a large volume of quantified information, it provides more than a general overview of what impacts will occur, and references materials in support of its conclusions.  Cf. Neighbors of Cuddy Mountain v. United States Forest Svc., 137 F.3d 1372, 1379 (9th Cir. 1998), Blue Mountains Biodiversity Project v. Blackwood, 161 F.3d 1208, 1214 (9th Cir. 1998).  The Service points to a letter from EPA concluding, based on the FEIS, that the project will improve water quality over the long term.  Ex. K.  EPA was critical of an earlier version of the project described in the DEIS, but its criticisms were satisfied by project modifications reflected in the FEIS.  Id.

With respect to visual WSR values, the FEIS states that so much standing and dead wood will be retained that most people

will not know that salvage harvest had occurred.  FEIS III-328-
29.  Salvage harvest boundaries will be irregular and blend with
unharvested areas.  Id.  Stumps will rapidly be covered by
vegetation and will rot within approximately three decades.  Id.
In the short term, cutting and helicopter logging will be visible
and audible.  Id.  No increase in turbidity in any eligible river
is expected due to 175-foot riparian buffers.  Id.

Consistent with the court's rulings in related cases
regarding the sufficiency of the Service's analysis of effects on
water quality, the court holds that defendants adequately
considered project effects on WSRs and WSR values.

B.  Consideration of Opposing Scientific Information

1.  Fire Risk

Plaintiffs argue that the Service violated NEPA by failing
to disclose and analyze scientific evidence that planned salvage
logging will increase the risk of catastrophic fire in
contravention of the stated purpose and need for the project to
reduce fuel for wildfires.

Citing to the declaration of research biologist Dr. Dennis
Odion, plaintiffs fault the Service for not disclosing and
addressing scientific evidence that small diameter materials
generated by logging (slash) increase the possibility and
intensity of future fires.  Dr. Odion states that salvage logging
will generate tons of slash which will be readily available as

18 - ORDER

ground fuel.  Odion Decl. at 1-3; FEIS Appx. B-51.  Odion also states that material in excess of 8" diameter does not contribute to fire intensity and detrimental fire effects.  Odion Decl., ¶ 8.

Plaintiffs do not address planned fuels mitigation measures common to all alternatives, or the Service's plan to treat activity fuels generated by logging with jackpot burning, broadcast burning, underburning, and handpiling and burning. FEIS II-48.  Nor do plaintiffs address tables in the errata sheet indicating that after planned slash treatments, only large materials will remain, which plaintiffs' evidence suggests do not appreciably increase fire risk.  Pls' Ex. 1.  The court rejects plaintiffs' claim that the Service violated NEPA by failing to disclose scientific information regarding increased fire risk attributable to salvage logging.  Consideration of effects to the physical environment is required; consideration of remote risks, is not.  See Bicycle Trails Council of Marin v. Babbit, 82 F.3d 1445, 1446 (9th Cir. 1996).  Rather than ignore the combustibility of slash, defendants planned to reduce the amount of slash.

        2.  Profitability

Plaintiffs contend that the Biscuit Project will not be as profitable as defendants assumed, and therefore will not fund recovery projects, and that the Service overestimated its

19 - ORDER

valuation of timber.  The court finds no evidence that the
Service will not perform planned recovery activities and
mitigation measures.  The court defers to the Service's
considered factual conclusions viewed at the time of the
conclusions, not with hind sight.  Assuming for argument that the
project is not as profitable as anticipated, changed conditions
are not enough to show that a decision was arbitrary and
capricious. The FEIS contains an adequate analysis of socio-
economic conditions and effects at FEIS III-385-407 and Appendix
I.

       3.  Habitat Restoration

    Citing to comments of Dr. Jerry Franklin, plaintiffs argue
that the project will not restore habitat.  The Service
considered and responded to Dr. Franklin's comments.  FEIS App.
L-21-31. As the court has held in related cases, the Service
permissibly concluded that the project meets NWFP salvage
guidelines for LSRs, which are designed to preserve and promote
late-successional habitat. At most, plaintiffs demonstrate a
dispute between scientists.  Plaintiffs do not demonstrate a NEPA
violation.

    C.  Site-Specific Soil Surveys

    Plaintiffs argue that the Service violated NEPA by failing
to conduct ground-based, site-specific soil surveys to ensure
compliance with SNF LRMP soil protection guideline 7-2.  The

guideline states that detrimental soil conditions should not exceed 15 percent of the total acreage within the activity area, including roads and landings. Pls' Ex. 6, SNF LRMP IV-44. The Service estimated present conditions, site productivity and sediment yield from aerial photography, GIS maps, modeling tools, monitoring reports from the 1987 Silver fire, ecology and erosion plots, and watershed analyses. FEIS III-74-75.

In Lands Council v. Powell, 395 F.3d 1019, 1035 (9th Cir. 2005), the court held that the Service violated NFMA by not ensuring the accuracy of its model-based estimates of detrimental soil conditions with on-site verification on the 1,408 acre timber harvest component of a larger watershed restoration project on the Idaho Panhandle National Forest. The court agreed with the reasoning in Kettle Range Conservation Group v. United States Forest Svc., 148 F. Supp. 2d 1107, 1127 (E.D. Wash. 2001), where the district court found a NEPA violation under similar circumstances. Id. at 1034-35. Thus, although Lands Council involved a NFMA violation, the case is arguably relevant to the resolution of plaintiffs' NEPA claim regarding guideline 7-2.

The methodology employed by the Service on the Biscuit Project is more robust than that used to estimate soil conditions for the Iron Honey Project at issue in the Lands Council case. In the latter instance, the Service relied on aerial photography and little or no testing of soils in the activity area. For the

21 - ORDER

Biscuit Project, the Service conducted soil investigations on five burned areas, in addition to "informal monitoring efforts" involving 40 aerial mulching study plots and 260 erosion plots. FEIS III-75, App. C-4, 11.  Based on this information and other sources mentioned above, the Service estimated the effects of alternatives on soil displacement and compaction in different watersheds.  FEIS III-74-75, 94, 99.  By March, 2004, surveyors had visited thirty percent of the proposed harvest units.  FEIS III-83.  In contrast to the projects at issue in Lands Council and Kettle Range, the Service in this case visited a significant portion of the activity area prior to completing the NEPA analysis for soils.  Cf. Lands Council, 395 F.3d at 1034.  The Service uses survey information to determine appropriate yarding, mitigation and monitoring systems based on site-specific conditions.  FEIS III-83.  Collected information is maintained in an "access database" on file at the Gold Beach Ranger District. FEIS III-83.

The circumstances of the Biscuit Project differ from those of the Iron Honey Project, at issue in the Lands Council case. The Biscuit Project involves salvage harvest of dead trees, whereas the Iron Honey Project called for shelterwood harvest that would have removed seventy percent of the canopy in areas slated for logging.  Lands Council, 395 F.3d at 1025, n.4.  Soil compaction may be of less concern on the Biscuit Project than on

the Iron Honey Project, as only 2,131 of 19,465 acres of planned
harvest areas were previously managed on the Biscuit Project.   In
contrast, the Iron Honey Project sought to remedy past
environmental degradation resulting from intense logging on
40,000 acres of the Little North Fork watershed since 1960.   The
salvage logging component of the Biscuit Project also eclipses
the timber harvest component of the Iron Honey Project in
geographic scale by a ratio of approximately 14:1 (19,465
acres:1,408 acres).   At some point, it may become impractical to
complete all unit surveys prior to preparation of an EIS, and to
include all of the information collected in the EIS.

    In Ecology Center, Inc. v. Austin, the court considered
whether the Service complied with a similar soil quality standard
in authorizing the Lolo National Forest Post Burn Project.   430
F.3d 1057 (9th Cir. 2005).   The majority, relying on Lands
Council, held that the Service violated NFMA and NEPA by failing
to adequately verify soil conditions in activities areas prior to
authorizing the project.   430 F.3d at 1071.   Approximately one
week after the court filed the opinion in Ecology Center, a panel
affirmed this court's order denying plaintiffs' motion for
preliminary injunction in part on the basis that the Service
conducted a more robust pre-authorization assessment of activity
areas than in the Lands Council case.   Lands Council and Ecology
Center do not provide a bright line rule as to how much of the

activity area the Service must visit before authorizing a project
in order to comply with the NFMA and NEPA regarding this soil
quality standard.  If such a rule should be drawn, perhaps it
would be better drawn by scientists and foresters than by judges.
Consistent with this court's order denying plaintiffs' motion for
preliminary injunction, the court of appeals' post-Ecology Center
affirmance, and considering the size of the salvage harvest
component of the Biscuit Project, the relatively limited extent
of previous logging activities, and the methodology employed by
the Service, which included on-site unit surveys prior to
publication of the FEIS, this court holds that the Service's pre-
authorization verification efforts, discussed above, were
sufficient to satisfy NEPA.

On summary judgment, plaintiffs have not briefed their claim
that the Service violated NEPA by using the "Decayed Wood
Advisor" modeling tool in managing snags and down wood.  The
court deems this claim abandoned.

II.  NFMA Claims

A.  Site-Specific Soil Surveys

Plaintiffs claim that the Service's failure to verify
compliance with SNF LRMP Guideline 7-2 with on-site soil surveys
violates NFMA.  Pls' Memo. at 38-39.  For the reasons discussed
in the context of plaintiffs' NEPA claim, the court finds Land
Council distinguishable, and further finds that defendants

24 - ORDER

adequately verified that the project will comply with the guideline.

B.  Violation of Standards for Management Area 8

Plaintiffs argue that planned salvage logging in management area 8 (MA-8) violates the SNF LRMP and NFMA. MA-8 designated areas at issue are overlapped by the NWFP's LSR system. The 1995 "Reconciliation Document" states that where an LSR overlaps an MA-8 area, the MA-8 area becomes LSR and is thereafter subject to standards and guidelines applicable to LSRs. Defs' Ex. O, RD-5. This provision is a reasonable interpretation of the Northwest Forest Plan, to which the court owes deference. NWFP ROD at C-3. Defendants are entitled to summary judgment on plaintiffs' NFMA claim for violations of MA-8 guidelines.[4]

Plaintiffs do not address their NFMA claims that the project does not meet LRMP standards for retaining snags and maintaining viability of management indicator species. Plaintiffs also do not argue their ARA claims. The court deems these claims abandoned.

<u>Conclusion</u>

Based on the foregoing, plaintiffs' motion for summary judgment [#75] is denied; defendants' motion for summary judgment

---

[4]In related cases, the court held that planned LSR salvage logging complies with NWFP LSR salvage guidelines. <u>Siskiyou Regional Education Project (SREP) v. Goodman</u>, 04-3058-CO, Order dated February 21, 2006, adopting Findings and Recommendations filed July 29, 2005.

25 - ORDER

[#79] is granted; plaintiffs' motion to strike [#85] is granted

in part; defendants' oral motion to strike is denied; plaintiffs'

motion to strike defendant-intervenors' response to plaintiffs'

notice of supplemental documentation [#117] is denied as moot.

IT IS SO ORDERED.

DATED this ⸺ day of March, 2006.

United States District Judge

26 - ORDER